IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ANN M. HENDRICKSON, | ) | Case No. 5:18-cv-2624 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Ann M. Hendrickson, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 405(g) and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11.  Because substantial evidence supported the ALJ's decision and because Hendrickson has not identified any error of law in the ALJ's evaluation of her claim, the final decision of the Commissioner must be AFFIRMED.

## II.     Procedural History

On March 15, 2016, Hendrickson applied for DIB.  On March 23, 2016, she applied for

SSI.  (Tr. 215, 219).[1]  Hendrickson alleged that she became disabled on April 25, 2015.  (Tr.

215, 219).  The Social Security Administration denied Hendrickson's applications initially and

upon reconsideration.  (Tr. 93, 109, 126, 140).  Hendrickson requested an administrative hearing.

(Tr. 166).  ALJ Reuben Sheperd heard Hendrickson's case on March 7, 2018, and denied the

claim in a May 9, 2018, decision.  (Tr. 18-32).  On September 28, 2018, the Appeals Council

denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr.

1-3).  On November 14, 2018, Hendrickson filed a complaint seeking judicial review of the

Commissioner's decision.  ECF Doc. 1.

## III.     Evidence

### A.     Relevant Medical Evidence

On August 19, 2014, Hendrickson saw Christine Spiroch, PhD, PA-C, at the Cleveland

Clinic Integrative Medicine department for treatment of Hashimoto's disease.  (Tr. 533).  Dr.

Spiroch had difficulty completing an intake because Hendrickson was late to her appointment

and would not focus on one symptom at a time.  (Tr. 532).  Dr. Spiroch ordered labs and referred

Hendrickson to endocrinology for a thyroid evaluation.  (Tr. 533).  On September 22, 2014,

Hendrickson saw Dr. Lyla Blake-Gumbs for her Hashimoto's disease.  (Tr. 529).  Dr. Blake-

Gumbs advised Hendrickson to avoid wheat and dairy and to start a probiotic.  (Tr. 531).  On

September 22, 2014, Hendrickson reported sleeping better since starting new thyroid medication.

She was advised to continue a gluten free diet and to add supplements including fish oil,

turmeric, and vitamin D.  (Tr. 454).

---

[1] The administrative transcript is in ECF Doc. 10.

On October 14, 2014, Hendrickson saw Dr. Susan Williams for her thyroid. (Tr. 524). She complained of fatigue and gastrointestinal issues. (Tr. 524). Dr. Williams noted that, despite normal thyroid stimulating hormone (TSH) and Free T3 and Free T4 function lab results, a different provider had prescribed additional thyroid medication to Hendrickson. (Tr. 524). Dr. Williams instructed Hendrickson to stop the additional medication, take only Synthroid, and ordered more lab tests in four weeks. (Tr. 525). A month later, Hendrickson called to renew her Synthroid prescription. The RN who took her call misunderstood Dr. Williams' notes and refused to renew the prescription. Due to this misunderstanding, several notes appear in the record indicating that Williams had not complied with the doctor's orders. (Tr. 517-518).

On February 19, 2015, Hendrickson saw Dr Jennifer Wojtowicz, D.O., for her Hashimoto's disease. (Tr. 363). Hendrickson complained of "brain fog, bloating, fatigue, chills, sinus headaches, asthma." Dr. Wojtowicz diagnosed chronic lymphocytic crisis or storm and "other malaise and fatigue." She ordered lab work and instructed that she would prescribe Tirosint for Hendrickson's thyroiditis. She recommended a low inflammatory diet and encouraged Hendrickson to try a probiotic. (Tr. 364).

On February 26, 2015, Hendrickson saw Dr. Mladen Golubic in integrative medicine. (Tr. 515). Hendrickson reported that she had eaten mostly organic, gluten-free for almost a year, but she sometimes cheated. (Tr. 515). She reported that she had started to meditate and read the Bible but had since stopped completely. She drank two glasses of wine per day and had difficulty staying asleep. (Tr. 515). Dr. Golubic told Hendrickson to continue a gluten-free, wheat-free, dairy-free, and casein-free diet, exercise more and meditate. (Tr. 517). On April 30, 2015, Hendrickson saw Dr. Golubic again. She reported that she was busy with her photography and was helping her parents clean their house and move. She was also taking two extra college courses. (Tr. 514). She had done a cleanse but was still drinking coffee, one to two glasses of

wine per night and continued to eat red meat. (Tr. 514). She was only occasionally doing relaxation practices. (Tr. 514). Dr. Golubic noted that Hendrickson complained that she was tired and stressed, but had not implemented the stress reduction practices or seen a mind body therapist. (Tr. 515). He told her to improve her diet and get more exercise. (Tr. 515).

Hendrickson saw Dr. Jessica Hutchins on May 19, 2015. She told Dr. Hutchins that she occasionally smoked and had an asthma attack. Dr. Hutchins found that Hendrickson likely had adrenal and mitochondrial dysfunction. (Tr. 455). On August 6, 2015, Hendrickson reported that her brain fog was worse, and she stated she had low energy and bloating. She said she had meditation tapes at home but wasn't using them. Dr. Hutchins ordered more tests. (Tr. 455).

On August 11, 2015, Hendrickson started treating with a new personal care provider, Kristin Havens, CNP. Hendrickson reported that she had a lot of food intolerances and had been told she had leaky gut syndrome. She said she had recently been diagnosed with chronic Lyme disease but did not have copies of reports. She also reported B12 deficiency anemia. (Tr. 392).

On August 18, 2015, Hendrickson saw allergist Dr. Mohan Durve. (Tr. 348). She reported having Hashimoto's disease and Lyme disease. (Tr. 354). She said her hobbies were tennis, walking, reading and playing cards. (Tr. 354). Dr. Durve listed Hendrickson's diagnosis as environmental allergy, perennial allergic rhinitis, asthma, and chronic lymphocytic thyroiditis. (Tr. 348). Dr. Durve prescribed azelastine spray, a saline nasal gel, fluticasone spray and an inhaler. (Tr. 348).

On August 28, 2015, Hendrickson returned to see Nurse Havens for back pain following a fall while taking pictures. (Tr. 410). Nurse Havens prescribed pain medication and ordered an MRI of Hendrickson's brain. (Tr. 413). The MRI showed no significant intracranial abnormality but mild chronic inflammatory changes involving the paranasal sinuses. (Tr. 548).

On September 8, 2015, Hendrickson followed up with Dr. Wojtowicz for her Hashimoto's disease. Hendrickson reported that she had a good appetite and was able to do her usual activities, but she still felt tired. (Tr. 362). She reported having Lyme disease. (Tr. 361). She reported taking 50 mcg of Tirosint. She had tried to add an additional 25 mcg, but it made her feel worse. (Tr. 362). Dr. Wojtowicz told her to try adding 13 mcg Tirosint instead of 25 mcg. She scheduled a follow-up appointment in six months. (Tr. 362). On September 11, 2015, Hendrickson reported to Dr. Hutchins that she had increased her Tirosint to 100 mcg on her own and felt horrible. (Tr. 465).

A lab test on September 30, 2015 showed that Hendrickson did not have Lyme disease. (Tr. 545). Another lab test on October 20, 2015 was also negative for Lyme disease. (Tr. 541).

On October 19, 2015, Hendrickson told Dr. Hutchins she felt 10% better. She said she was worried about Lyme, mold, metals and why she felt so horrible 3-4 weeks into candida treatment. (Tr. 456). Hendrickson's lab results did not indicate that her chronic inflammatory response syndrome ("CIRS") was from mold. On November 30, 2015, Dr. Hutchins ordered additional tests and discussed that an underlying chronic infection could possibly be causing Hendrickson's inflammation/immune dysfunction. (Tr. 457).

The record contains notes regarding many calls Hendrickson placed to her medical providers. For example, in October and November 2015, Hendrickson called her providers three times about nasal spray prescriptions. (Tr. 487). She asked about alternative prescriptions because of insurance denials and provided information for an out-of-state pharmacy. In mid-November, Hendrickson called four times, asking for specific prescriptions; identifying a different provider and pharmacy who would prescribe supplements; and indicating the end period and how to write the prescription for insurance approval. (Tr. 486-487).

On December 14, 2015, Hendrickson saw Nurse Havens.  Hendrickson requested new lab work for her thyroid and ferritin.  (Tr. 403).  Havens agreed to recheck Hendrickson's labs but told her that any medication changes and monitoring would have to come from her endocrinologist.  (Tr. 404).  Havens discussed with Hendrickson multiple provider issues and appropriate delegation of services so that tests and treatment were not duplicated.  (Tr. 405).

On January 14, 2016, Dr. Hutchins suggested that Hendrickson start using glutathione nasal spray.  (Tr. 459).  On January 28, 2014, Hendrickson saw Dr. Jonny Su for a referral based on elevated antinuclear antibody ("ANA") levels.  (Tr. 463).  Dr. Su thought that Hendrickson's elevated ANA test was most likely due to thyroid antibodies.  An MRI on February 4, 2016 returned unremarkable results.  (Tr. 535).

On February 1, 2016, Hendrickson called the Cleveland Clinic for approval of a lab test.  (Tr. 468).  From February 12 to 16, Hendrickson called six times and e-mailed requesting specific blood work from a specific lab.  (Tr. 461-462).

Hendrickson followed up with Dr. Wojtowicz on March 10, 2016.  (Tr. 359).  She reported that she was told she had Lyme disease by a "functional doc."  (Tr. 359).  Hendrickson reported a good appetite and that she was able to do her usual activities.  (Tr. 360).  Dr. Wojtowicz ordered thyroid labs and told Hendrickson to check the levels in the morning before taking Tirosint.  (Tr. 360).  On March 23, 2016, Hendrickson told Dr. Hutchins that her brain fog was improving with the glutathione spray.  (Tr. 459).

On March 29, 2016, Dr. Durve completed a questionnaire.  He noted that Hendrickson's allergies improved with injections but she stopped receiving them because she said her class conflicted with her injections and she was not open to self-administration.  (Tr. 337).  Dr. Durve opined that "very dusty or moldy environments would most likely trigger allergic/asthmatic symptoms" but Hendrickson did not have any physical limitations.  And, he opined that she had

no clear deficit in her ability to concentrate and think clearly. He noted that she was able to repeat instructions back to nursing staff. (Tr. 337).

Between March 28, 2016 and March 31, 2016, Hendrickson called Dr. Hutchins' office at the Cleveland Clinic three times requesting a prescription for B12 shots. (Tr. 452).

On April 28, 2016, Hendrickson saw Dr. Hutchins who believed Hendrickson's breathing issues were likely caused by mycotoxin CIRS. (Tr. 670). Hendrickson called the Cleveland Clinic several times in early May regarding her labs and sent "MyChart" messages. (Tr. 662). On May 25, 2016, Hendrickson told Dr. Hutchins that she thought the glutathione spray was helping. (Tr. 661).

On June 1, 2016, Dr. Su returned Hendrickson's call and told her that her lab results showed no evidence of lupus. (Tr. 653). On June 10, 2016, Hendrickson reported that the glutathione was helping her "brain fog." Dr. Hutchins noted that the brain fog was improving with detox support. (Tr. 652).

On June 22, 2016, Hendrickson saw Dr. Scarlet Soriano in mind-body medicine. (Tr. 642). Hendrickson said she was reading "The Healing Code," and had read "Radical Remission." She had meditation tapes but had not used them. (Tr. 642). Dr. Soriano assessed anxiety and dysthymia and recommended an elimination diet, more exercise and referred Hendrickson to therapy. (Tr. 643).

On June 23, 2016, Hendrickson saw Dr. Su who opined again that Hendrickson's positive ANA test was likely due to her Hashimoto's disease and suggested that her vitamin D levels be checked as a potential cause for her fatigue. (Tr. 641).

On July 5, 2016, Hendrickson was a no-show for her psychology appointment at the Cleveland Clinic. (Tr. 637). On July 6, 2016, Dr. Soriano diagnosed attention and concentration deficit and encouraged Hendrickson to remain on a gluten, dairy and sugar-free diet and to avoid

alcohol.  (Tr. 636).  Dr. Soriano told Hendrickson to do energy routine exercises twice a day and to follow-up in a few weeks.  (Tr. 636-637).

On September 14, 2016, Hendrickson told Dr. Hutchins that she still felt scattered and her B12 shots were causing extreme fatigue.  (Tr. 871).  On October 17, 2016, Hendrickson told Dr. Hutchins that her symptoms improved when she was on a strict diet and then worsened when she didn't follow the strict diet.  (Tr. 891).  On October 27, 2016, Dr. Wojtowicz added Vitamin D for Hendrickson's fatigue and increased her dosage of Tirosint for her thyroid.  (Tr. 934).

On January 10, 2017, Hendrickson requested new thyroid and ferritin lab tests from Nurse Havens.  (Tr. 938).  Havens told Hendrickson that there was no need to continually check her thyroid panels, but she ordered the lab work because Hendrickson was adamant.  (Tr. 940). The lab work was completed on January 13, 2017.  Nurse Havens reviewed the results and noted that Hendrickson should be told that her thyroid, iron and cholesterol levels looked good/stable. (Tr. 946).

Hendrickson followed-up with Dr. Wojtowicz in June 2017.  (Tr. 930-931).  Dr. Wojtowicz continued with the same dosage of Tirosint.  (Tr. 631).

On September 27, 2017, Hendrickson saw Dr. Brenda Powell.  Hendrickson reported living with her parents and having been exposed to mold.  She requested repeat blood tests for C4a, TGF and her thyroid.  (Tr. 963).  Dr. Powell recommended reducing inflammation and ordered the requested labs.  (Tr. 966-967).  In November, Hendrickson returned to see Dr. Powell with continued complaints of no energy or ability to concentrate.  Dr. Powell ordered more lab tests.  (Tr. 984).

Hendrickson saw Dr. Powell on January 4, 2018.  She had moved out of her parents' house, had better mental clarity and felt better.  Hendrickson requested temporary disability papers due to her "brain fog," poor focus, loss of concentration, forgetfulness, fatigue and

malaise.  (Tr. 995).  Dr. Powell ordered more lab tests.  (Tr. 999).  Hendrickson followed-up with Dr. Powell on January 23, 2018.  She stated that she would not move back in with her parents due to mold exposure and was planning to live with her aunt.  (Tr. 1006).

On January 30, 2018, Hendrickson saw Dr. Wojtowicz and complained of fatigue.  Dr. Wojtowicz renewed Hendrickson's Tirosint prescriptions and added 5mcg of liothyronine.  (Tr. 1023).

### B.      Relevant Opinion Evidence

#### 1.      Treating Physician – Dr. Jessica Hutchins – May 2016

On May 26, 2016, Dr. Jessica Hutchins wrote a short letter - to whom it may concern – stating that Hendrickson was being treated for Hashimoto's thyroiditis, immune dysfunction, mycotoxin illness (chronic immune response syndrome), and dysbiosis.  She opined that these conditions could cause significant cognitive impairment with fatigue.  Dr. Hutchins stated that there were many abnormal lab results supporting Hendrickson's diagnoses.  She further opined that it could be months to years before Hendrickson improved enough to work.  (Tr. 436).

#### 2.      Treating Physician – Brenda Powell – January 2018

On January 23, 2018, Dr. Powell competed a medical source statement.  (Tr. 1017-1020).  Dr. Powell listed Hendrickson's diagnoses as Hashimoto's thyroiditis, mycotoxin exposure, and chronic fatigue syndrome.  She opined that Hendrickson had severe physical restrictions and was incapable of tolerating even "low stress" due to her poor memory and executive function.  She opined that  Hendrickson would miss more than four days of work per month due to her impairments and would have side effects from environmental conditions.  (Tr. 1020).

#### 3.      Consultative Examiner – Joshua Magleby, Ph.D. – June 2016

On June 1, 2016, Joshua Magleby, Ph.D., examined Hendrickson, performed intelligence testing and completed a report.  (Tr. 623-630).  Hendrickson reported that her main complaint

was that her "brain inside just shakes," she could not think clearly, and "sometimes fatigue." (Tr. 624-624). She reported that she lived with her parents, could take care of her personal needs, and was mostly independent with activities of daily living, but she felt weak. (Tr. 625). Dr. Magleby diagnosed an unspecified neurocognitive disorder. (Tr. 628). He noted her "memory appeared at least somewhat impaired for both verbal and visual information. The claimant's ability to follow more complex instructions or directions appears to be somewhat impaired for age expectations." Her "ability to maintain attention and concentration seems somewhat impaired compared to other adults the same age. Persistence and pace in providing personal information and responses to mental status appear somewhat impaired compared to other adults the same age." He opined that her "ability to withstand the mental stress and pressures associated with day-to-day work activity appear somewhat impaired mostly by frustration related to cognitive impairments." His opinion was based on Hendrickson's complaints on the exam, her psychiatric history and estimated adaptive behaviors. (Tr. 629).

### 4. State Agency Psychological Consultants

On June 17, 2016, state agency consultant, Jaime Lai, Psy.D., reviewed Hendrickson's records and opined that she did not have significant limitations in carrying out short, simple or detailed instructions or in sustaining an ordinary routine. (Tr. 90-91). She opined that Hendrickson had moderate limitations in maintaining concentration, persistence and pace and in understanding and remembering detailed instructions. (Tr. 87, 90). Dr. Lai opined that Hendrickson retained the ability to understand, remember, and carry out simple one to three step job tasks that are fairly static in nature, did not require extended periods of focused attention to task in order to complete, did not require a consistent pace or appearance to strict deadlines, and that did not have strict production quotas. (Tr. 90-91).

Kristine Haskins, Psy.D., reviewed Hendrickson's records on September 21, 2016 and generally agreed with the functional limitations opined by Dr. Lai. (Tr. 123-124).

### C. Relevant Testimonial Evidence

Hendrickson testified at the ALJ hearing on March 7, 2018. (Tr. 45-69). She had just turned 53 years old. (Tr. 46). She was temporarily living with her parents. (Tr. 46). Hendrickson was single and had an adult daughter. (Tr. 47). She had a driver's license and was able to drive. (Tr. 48). She had graduated from high school and had earned college credits, almost obtaining her bachelor's degree. (Tr. 49).

Hendrickson previously worked as a photographer. She operated her own photography business, started by her father. (Tr. 49-50). In that job, she was very active and lifted heavy equipment, over 20 pounds. (Tr. 50). She stopped consistently working in 2016. (Tr. 51).

Hendrickson stopped working due to "brain inflammation" or "brain fog" and fatigue. In 2016, Hendrickson said she was incapable of even typing an e-mail. (Tr. 52). By "brain fog," Hendrickson meant that her memory wasn't very good; she forgot things; was easily confused; and her focus and concentration were poor. (Tr. 53). Hendrickson had pursued holistic, homeopathic type treatments and some of them had helped her. (Tr. 53). She had good days and bad days. She didn't sleep well. (Tr. 54, 67). She had poor short term memory and couldn't concentrate to do a job. (Tr. 54-57). She also had anxiety and panic attacks. (Tr. 58-59). Hendrickson testified that she had dysbiosis and mycotoxin and parasites that were negatively impacting her energy levels. (Tr. 62-63). She also had asthma. (Tr. 64-65). She used an inhaler and a nebulizer. (Tr. 65).

Hendrickson was able to manage her own personal hygiene. She could help around the house and cook on good days. She went grocery shopping once a week. She enjoyed reading and photography. (Tr. 68).

Roxanne Benoit, a vocational expert ("VE"), also testified at the hearing. (Tr. 69-74). She found that Hendrickson previously worked as a photographer. (Tr. 70). The ALJ directed the VE to consider a hypothetical individual who could perform a full range of light work but was limited to occasional climbing of ramps and stairs; could never climb ladders, ropes or scaffolds; could not be exposed to unprotected heights or moving mechanical parts; was limited to performing simple, routine tasks, but not at a production rate pace; was limited to making simple, work-related decisions; could tolerate few changes in a routine work setting; and was limited to frequent interaction with coworkers and the general public. (Tr. 70-71). The VE testified that such an individual could not perform Hendrickson's past work but could work as a cafeteria attendant, information clerk and sorter. (Tr. 71-72). If the individual was limited to a full range of sedentary work, the VE opined that she could work as a document preparer, a sorter and a final assembler. (Tr. 72-73).

If the individual required daily re-instruction on all job tasks from her supervisor, there would be no work at any level. If the individual was off-task 25% of the time there would be no work. (Tr. 73). And, if the individual consistently missed one to two days of work per month, her employment would eventually be terminated. (Tr. 74).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. Hendrickson had the following severe impairment: Hashimoto's disease, and neurocognitive and anxiety disorders. (Tr. 20).

4. Hendrickson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 21).

5. Hendrickson had the residual functional capacity to perform light work, except she was limited to occasional climbing ramps or stairs; she could never climb ladders, ropes or scaffolds; and she was required to avoid all workplace hazards, such as unprotected heights and moving mechanical parts. Mentally, she was limited to simple, routine tasks not performed at a production rate pace

and not requiring more than simple work-related decisions; she could
frequently interact with co-workers and general public, but she could tolerate
few changes in her routine work setting. (Tr. 22).

10. Considering her age, education, work experience, and residual functional
capacity, there were jobs existing in significant numbers in the national
economy that Hendrickson could perform. (Tr. 30).

Based on all his findings, the ALJ determined that Hendrickson was not under a disability from

April 25, 2015, the alleged onset date, through the date of his decision. (Tr. 31).

## V.     Law & Analysis

### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was

supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C.

§ 405(g); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). Substantial evidence

is any relevant evidence, greater than a scintilla, that a reasonable person would accept as

adequate to support a conclusion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir.

2007).

Under this standard, the court does not decide the facts anew, evaluate credibility, or

re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). If

supported by substantial evidence and reasonably drawn from the record, the Commissioner's

factual findings are conclusive – even if this court would reach a different conclusion or

evidence could have supported a different conclusion. 42 U.S.C. §§ 405(g); *see also Elam*, 348

F.3d at 125 ("The decision must be affirmed if . . . supported by substantial evidence, even if that

evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that

this court agree with the Commissioner's finding, as long as it is substantially supported in the

record."). This is so because the Commissioner enjoys a "zone of choice" within which to

decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if supported by substantial evidence, however, the court will not uphold the Commissioner's decision when the Commissioner failed to apply proper legal standards, unless the error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, -2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

## B.    Medical Opinions

Hendrickson argues that the ALJ improperly weighed the opinions of the state-agency reviewing psychologists and failed to explain the limited weight he assigned to their opinions. Specifically, Hendrickson contends that the ALJ did not address the reviewing psychologists' opinions that Hendrickson's impairments would limit her ability to "maintain attention and concentration for extended periods." ECF Doc. 13 at 8. And she contends the ALJ failed to incorporate limitations into Hendrickson's RFC that accounted for the limitations expressed by the state-agency reviewers even though the ALJ never disputed those limitations. *Id.* Conversely, the Commissioner argues that the ALJ properly weighed the medical opinions in this case and provided an adequate explanation. ECF Doc. 15 at 14-19.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. §§ 404.1527(c), 416.927(c).[2] An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)). Good reasons for rejecting a treating physician's opinion

---

[2] 20 C.F.R. §§ 404.1527(c) and 416.927(c) apply because Kance's claim was filed before March 27, 2017.

may include that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. §§ 404.1527(c), 20 C.F.R. § 416.927(c).

Here, Hendrickson doesn't argue that the ALJ improperly weighed a treating source's opinion. Rather, she argues that he failed to explain the weight he assigned to the opinions of the state-agency reviewing psychologists. "Generally, [the Social Security Administration] give[s] more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you. See 20 C.F.R. §§ 404.1527(c)(1). However, Social Security Ruling ("SSR") 96-8p, 1996 SSR LEXIS 5 , 1996 WL 374184 (July 2, 1996), cautions that an ALJ "must always consider and address medical source opinions [and] [i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *See also Puckett v. Colvin*, 2014 U.S. Dist. LEXIS 55079, 2014 WL 1584166 at * 9 (N.D. Ohio, April 21, 2014) (explaining that, although the ALJ was not required to evaluate opinions of consultative examiners with the same standard of deference as would apply to an opinion of a treating source, he was required to "acknowledge that [the examiners'] opinions contradicted his RFC finding and explain why he did not include their limitations in his determination of Plaintiff's RFC"). The requirement that an ALJ explain the weight afforded to a non-treating source's opinion should not be construed as rigorously as the treating physician rule. *See, e.g., Jefferson v. Colvin*, No. 1:14cv01851, 2015 U.S. Dist. LEXIS 94716, 2015 WL 4459928 at *6 (N.D. Ohio 2015) (White, M.J.) (citations omitted); *Chandler v. Comm'r of Soc. Sec.*, No. 2:13cv324, 2014 U.S. Dist. LEXIS 90128, 2014 WL 2988433 (S.D. Ohio, July 1,

2014) ("the ALJ is not required to give 'good reasons' for rejecting a nontreating source's opinions in the same way as must be done for a treating source").

Here, the ALJ assigned controlling weight to the opinion of Hendrickson's treating physician, Dr. Durve; "significant" weight to the opinion of consulting examiner, Joshua Magleby, Ph.D., little weight to the opinion of treating physician, Brenda Powell, M.D., and little weight to the opinions of the state agency reviewing psychologists. Concerning the state agency reviewing psychologists' opinions, the ALJ stated:

> State agency psychological consultants, Jaime Lai, Psy.D. and Kristen Haskins, Psy.D., each concluded from independent analyses of the record that Dr. Magleby's assessment was well-informed and probative, and they further concluded that the claimant's mental limitations in work-related functioning are generally mild to no more than moderate (Exhibits 1A, 2A, 5A, 6A). While these assignments utilized historical criteria and are therefore accorded limited weight, I agree that the medical evidence and the record evidence as a whole fails to establish that the claimant has marked limitations in concentration/persistence/pace or any other area of work-related functioning, and I find that the claimant retains the capacity to perform the range of mental work activities set forth above on a regular and sustained basis.
>
> In according the claimant every reasonable beneficial construction of the evidence, however, I accorded little weight to the opinions of the State agency medical consultants, who concluded that the claimant requires environmental limitations due to her asthma but otherwise retains the ability to perform medium work on a regular and sustained basis. (Exhibits 1A, 2A, 5A, 6A). The totality of the evidence does not support the finding the claimant's asthma/allergy impairment to be severe, but the totality of the evidence, including the claimant's performances of light work into 2016, does support finding that since April 2015, the claimant has retained the ability to perform a range of light work.

The state agency reviewing psychologists opined that Hendrickson would be able to "complete simple, 1-3 step job tasks that are fairly static in nature, do not require extended periods of focused attention to task in order to compete, do not require a consistent pace or adherence to strict deadlines, and that do not have strict production quotas." (Tr. 123). In determining Hendrickson's RFC, the ALJ found that she was limited to simple, routine tasks not performed at a production rate pace and not requiring more than simple work-related decisions.

She could frequently interact with co-workers and the general public, but she can tolerate few changes in her routine work setting." (Tr. 22).

Agency regulations require the ALJ to consider the medical source opinions. There can be no good faith contention that the ALJ here failed to meet that requirement. The dispute Hendrickson has with the ALJ's opinion is based on her contention that the ALJ's RCF conflicted with the state-agency reviewers' opinions. While such an argument may be posed because the words used by the ALJ in his statement of Hendrickson's RFC did not precisely match the limitations expressed by the state-agency psychologists, those differences alone do not answer the question of whether the limitations actually conflicted. By limiting Hendrickson to simple, routine tasks not performed at a production rate pace, the ALJ appears to have incorporated the state-agency reviewing psychologists' opinions into his RFC. And, as discussed more thoroughly below, the ALJ offered numerous references throughout his decision to things Hendrickson could do which also supported his RFC. Contrary to Hendrickson's assertions, the court concludes that the ALJ did not necessarily fail to incorporate the limitations opined by the state agency psychologists. Moreover, the ALJ was not required to provide a more detailed explanation of his decision to assign limited weight to their opinions and it appears that the mental limitations in Hendrickson's RFC are generally consistent with the state agency reviewing psychologists' opinions. Regarding her physical abilities, the ALJ actually found that Hendrickson was *more* limited than the state-agency reviewers. The ALJ adequately supported the weight assigned to the state-agency reviewing psychologists.

Further, this court finds that the ALJ did not err in explaining the weight he assigned to the state-agency psychologists. Nonetheless, the court will consider Hendrickson's related argument - that the error was not harmless. Hendrickson argues that the ALJ's claimed error in failing to explain the weight assigned to the opinions of the state agency psychologists was not

harmless because, when asked whether a hypothetical individual could perform any jobs if she could not work at a consistent pace, the VE interpreted counsel's question to mean that the individual would be "off-task." And, the VE then opined that there would not be any jobs for an individual who was off task more than 25% of the workday. (Tr. 73). Hendrickson argues that, *based on the VE's testimony,* the RFC should have included an off-task percentage. This argument puts the cart before the horse. The VE opined on whether jobs were available for a hypothetical individual with what the ALJ found to be Hendrickson's RFC. The VE did not determine the RFC; the ALJ did. The VE's statements regarding concentrating and being off-task were based on a hypothetical question from Hendrickson's counsel. They were not based on evidence from the record showing that Hendrickson would be off task more than 25%. And Hendrickson doesn't cite any evidence supporting this limitation; instead, she assumes the moderate limitations in maintaining concentration, persistence and pace expressed by the state-agency psychologists equated to a certain inability to stay on task. The ALJ was required to determine the RFC after considering all of the evidence in the record; as discussed above, he did just that. He was not required to add this limitation to the RFC based on the VE's testimony regarding a hypothetical individual.

The court is not persuaded by Hendrickson's argument. Yes, the state-agency reviewing psychologists opined that Hendrickson was limited to simple jobs that did not require a consistent pace or adherence to strict deadlines. But, the ALJ appears to have incorporated this limitation into his RFC finding. In response to counsel's question, the VE testified that she thought someone who "could not work at a consistent pace" would be considered "off task." She further opined that someone who was off task 25% of the time would not be able to maintain employment. But, the VE's interpretation of counsel's question did not equate to the state-agency psychologists opining that Hendrickson would be off task 25% of the time. They offered

no such opinion. And, the ALJ's hypothetical question to the VE included that the individual was "limited to the performance of simple, routine tasks but not at a production rate pace…." Moreover, the fact that the VE interpreted Hendrickson's attorney to be asking an off-task question has little bearing on the ALJ's RFC decision absent substantial evidence in the record that Hendrickson would actually be off task more than 25% of the time. And, as already noted, Hendrickson does not cite any evidence supporting such a finding. The ALJ's questions to the VE and his RFC determination appear to be congruent with the state-agency psychologists' opinions that Hendrickson was limited to simple work not requiring a consistent pace. At a minimum, the ALJ's analysis and RFC finding was supported by substantial evidence. Hendrickson fails to identify an error in the ALJ's decision at Step Five.

### C. Hendrickson's Fatigue and Difficulty Concentrating

Next, Hendrickson argues that the ALJ failed to build a logical bridge between his decision and the evidence. Specifically, she argues that he failed to properly evaluate her fatigue and difficulty concentrating in accordance with 20 C.F.R. § 404.1529(c), § 416.929(c) and SSR 16-3, 2016 SSR LEXIS 4. 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3) recognize that an individual's symptoms sometimes suggest that an individual's impairments are more severe than shown by objective medical evidence alone. The regulations require the Commissioner to employ a two-step process when considering subjective symptom complaints. At Step One, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms.

> An individual's symptoms, such as pain, fatigue, shortness of breath, weakness, nervousness, or periods of poor concentration will not be found to affect the ability to perform work-related activities for an adult or to function independently, appropriately, and effectively in an age-appropriate manner for a child with a title XVI disability claim unless medical signs or laboratory findings show a medically determinable impairment is present.

SSR 16-3.

Step Two requires the ALJ to evaluate the intensity and persistence of symptoms such as pain and determine the extent to which the symptoms limit the claimant's ability to perform work-related activities.

> If we cannot make a disability determination or decision that is fully favorable based solely on objective medical evidence, then we carefully consider other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms. Other evidence that we will consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in our regulations.

SSR 16-3.

20 C.F.R. § 404.1529 (c)(3) and § 416.929(c)(3) list seven factors relevant to a claimant's symptoms:

> (i)  daily activities;
>
> (ii)  The location, duration, frequency, and intensity of symptoms;
>
> (iii)  Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medications;
>
> (v)  Treatment, other than medication, you receive or have received for relief of the symptoms;
>
> (vi)  Any measures used to relieve the symptoms; and
>
> (vii)  Other factors concerning functional limitations and restrictions due to pain or other symptoms.

Hendrickson argues that the ALJ did not follow these regulations and/or explain how he considered her symptoms of fatigue and loss of concentration in accordance with these regulations. She contends that he found in her favor on Step One of the process but did not properly evaluate her statements in accordance with Step Two. Hendrickson also argues that the ALJ did not assess her credibility properly when considering her statements. For example, she

argues that he should have considered that she had good days and bad days; she had a strong

work history; and she diligently pursued medical treatment in this case.

Because Hendrickson argues that the ALJ found in her favor at Step One, the court will

focus its review on the ALJ's decision at Step Two.  After doing so, the court finds that he

properly evaluated Hendrickson's symptoms of fatigue and lack of concentration using the two-

step process required by the regulations.  The ALJ expressly stated that that he had considered all

the evidence and all of claimant's alleged symptoms pursuant to the two-step process.  (Tr. 23).

And, as argued by the Commissioner, there is no requirement that he discuss every factor listed

in 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3).  *Young v. Comm'r,* No. 1:16 CV 1372, 2017

U.S. Dist. LEXIS 112306 (N.D. Ohio July 19, 2017); *White v. Comm'r of Soc. Sec.,* 572 F.3d

272, 287 (6th Cir. 2009);  *Roberts v. Astrue,* 2010 U.S. Dist. LEXIS 56685, 2010 WL 2342492,

at *11 (N.D. Ohio).  In compliance with 20 C.F.R. § 404.1529(c)(3) and § 416.929(c)(3) and

SSR 16-3, the ALJ discussed some of the factors he considered in assessing Hendrickson's

subjective symptoms.

For one example, the ALJ discussed Hendrickson's activities of daily living:

The claimant stated that she currently lives with her 23 year old daughter and an
aunt.  She reported that on a typical day she sleeps poorly but is able to complete
routine tasks of self-care and some household tasks.  She drives, she occasionally
cooks, she shops about once per week and she attends church regularly with a
friend or her brother.  The claimant related that she enjoys reading and has
recently been reading "medical stuff" in an effort to get better and get back to
doing the photography work that she always loved.

(Tr. 24).  He also discussed that, in 2015, after her onset date, she stated that she was "very busy"

with her photography work, she was helping her parents clean and move and was taking two

extra classes at the Tri-C with her daughter.  (Tr. 25).  In August 2015, Hendrickson's reported

hobbies were "tennis, walking, reading [and] playing cards."  (Tr. 25).  In June 2016,

Hendrickson reported being independent and appropriate in her self-care to Dr. Magleby.

The ALJ noted that even though Hendrickson testified that she "really hit the wall" in 2016, she reported to Dr. Hutchins that her "brain fog" was improving and she attributed it to the glutathione spray Dr. Hutchins had prescribed. (Tr. 26). She also told Dr. Magleby that the glutathione spray was helping her brain fog. (Tr. 27). Thus, the ALJ considered medications that Hendrickson was taking and that they seemed to improve her ability to concentrate.

Regarding precipitating and aggravating factors, the ALJ noted that Hendrickson reported on different occasions that her boyfriend's substance abuse was causing stress. However, she continued living with him off and on. And she did not implement stress reduction practices recommended by her providers. (Tr. 25, 28).

Considering Hendrickson's treatment, the ALJ summarized the medical evidence and the medical opinions. Excepting the state-agency reviewing psychologists' opinions already discussed above, Hendrickson does not argue that the ALJ's evaluation of the medical opinions was deficient. The ALJ noted that, but for acute physical issues, findings from routine physical examinations of Hendrickson were unremarkable. He observed that she sought treatment from functional/holistic providers for her fatigue, cognition and memory complaints. (Tr. 24).

The ALJ expressly discussed several of the factors to be considered in evaluating a claimant's subjective complaints of fatigue or poor concentration, including Hendrickson's daily activities, her medications, precipitating and aggravating factors and the treatment she sought. See 20 C.F.R. § 404.1529(c). Taken as a whole, the ALJ's decision determining that Hendrickson's subjective symptom complaints were contradicted in part by the record, is supported by substantial evidence, and the ALJ sufficiently explained his reasoning. The ALJ was plainly aware that Hendrickson asserted she had both good and bad days. The ALJ considered the complaints that Hendrickson made to medical providers, presumably regarding bad days, and took these into account in evaluating her symptoms of fatigue and poor

concentration.  Notably, given the multitude of essentially normal findings in Hendrickson's medical records, it appears that Hendrickson may never have been able to be at a medical provider's office on one of her "bad" days.  In the absence of more concrete medical evidence, the ALJ was justified in his findings concerning the supportability of Hendrickson's subjective symptom complaints.

Regarding Hendrickson's strong work history, the ALJ considered that Hendrickson had continued working into 2016, even though she claimed that her disability began in April 2015.  Although continuing to work may show Hendrickson's strong work ethic, it is also evidence that she was capable of performing work.  Hendrickson argues the ALJ essentially punished her for these efforts to work.  But it was not improper for the ALJ to consider that Hendrickson could work.  Hendrickson cites no authority stating otherwise.

Hendrickson also complains that the ALJ weighed against her the fact that she was able to keep her appointments and follow-up with medical providers regarding lab tests and prescriptions.  Again, the court finds that, in the context of this case, it was not improper for the ALJ to consider these facts.  The record contains numerous references to Hendrickson researching her medical symptoms, asking medical providers for specific tests, and following up regarding prescriptions.  (Tr. 403, 452, 468, 486-487, 642, 662, 938-940).  This shows that Hendrickson was diligent in seeking treatment.  It also tends to suggest, as the ALJ seems to have found, that she was capable of a certain amount of focus and concentration.  Indeed, treating source Dr. Durve noted that Hendrickson did not seem to have a deficit in her ability to concentrate and think clearly because she was able to repeat instructions back to nursing staff. (Tr. 337).  Because Hendrickson alleges an inability to work due to poor concentration, the ALJ did not err in considering portions of the record showing that she was able to concentrate on diligently seek medical treatment and following-up with medical providers.

The ALJ supported his conclusions concerning Hendrickson's subjective symptom complaints with substantial evidence.  That was enough to satisfy the Social Security legal standards, even if this court might have found otherwise if taking a fresh look at the issue.

**VI.**     **Conclusion**

Because substantial evidence supports the ALJ's decision and Hendrickson fails to identify any error of law, the Commissioner's final decision denying Hendrickson's applications for SSI and DIB are AFFIRMED.

**IT IS SO ORDERED.**

Dated: September 5, 2019

Thomas M. Parker
United States Magistrate Judge